Michael Machat, Esq.
Jeremy Friedman, Esq. (*pro hac vice* pending)
MACHAT & ASSOCIATES, P.C.
8730 W. Sunset Blvd., Ste. 250
W. Hollywood, California 90069
Telephone: (310) 860-1833
Email: michael@machatlaw.com
      jeremy@machatlaw.com

Attorneys for Plaintiffs

-----------------------------------------------------------------X

| | |
|---|---|
| BiCoastal Productions, Inc, Garry Peterson, James Kale, KALPET LP, Entertainment Services International, LLC, Derek Sharp, Greg Smith, Michael Staertow, Teddy Andreadis, Leonard Shaw, Howard Klopak, Brent Moreland, Linda Leichtweis, RAM Production, Inc., Music Works Concerts, MRC Productions, Elko Concerts, and Onesti Entertainment Corporation, | COMPLAINT<br><br>JURY TRIAL DEMANDED |
|             Plaintiffs, | |
|       -against- | |
| Broadcast Music, Inc., | |
|             Defendant. | |

-----------------------------------------------------------------X

     Plaintiffs hereby allege and assert:

## I.    <u>INTRODUCTORY SUMMARY</u>

    1.    Plaintiffs are persons and business entities that were involved with organizing, promoting, performing, and producing live concerts by the band The Guess Who (herein, "the band"), including those scheduled on April 6, 2024 and thereafter – for which there were existing contracts with venues and otherwise.  The organization and promoting of the concerts had been ongoing for many months.  At the planned concerts, the band was scheduled to perform music compositions whose copyrights were held by a third party; the band would play this music

pursuant to license arrangements between the concert venues and the performing rights

organization Defendant Broadcast Music, Inc. ("BMI").

2.      At the eleventh hour, right before the scheduled concert dates commenced in April

2024, the copyright holder gave notice of its decision to terminate all other parties' rights to

perform the music in public.  Plaintiffs inquired to BMI as to what was the effective date of the

termination of rights, and (on April 6 and 10, 2024) BMI – through an executive with the titles of

senior vice president and chief legal officer of BMI – stated that the termination was effective

"immediately".  In reliance on BMI's statement, Plaintiffs cancelled all of the scheduled concerts

and stopped booking new concerts, thereby suffering vast financial harm.

3.      Much more recently, through happenstance, Plaintiffs have  ascertained that BMI's

representation – that the termination was  effective "immediately" – was apparently false.  The

falsity of the statement reflects BMI's negligence.  Alternatively, if BMI's representation (as to

the effective date of the termination of rights) were actually true, then this would mean that

BMI's long-time, ongoing, continuous representations – as to the very nature of the services that

it supposedly provides in securing performance rights – were false when made, which would

reflect the deliberate intent to deceive (or, alternatively, negligence).

4.      BMI  is  liable for the harm that it has caused and additional damages.

## II.      <u>JURISDICTION AND VENUE</u>

5.      Plaintiff brings this action for injunctive relief and damages arising

out of the breach of fiduciary duties, negligent misrepresentations, fraud of Defendant BMI.

6.      This suit is brought pursuant to this Court's diversity jurisdiction is conferred on

this Court by 28 U.S.C. § 1332. The amount in controversy is greater than $75,000 and the

parties on each side of the dispute are citizens of different states. In particular, Defendant BMI is

a Delaware Corporation headquartered in New York, and none of the Plaintiffs are residents of –

or are business entities with principal places of business in – either Delaware or New York, so that the parties on each side of the dispute citizens and residents of different states.

7.      This Court has personal jurisdiction over Defendant by virtue of (*inter alia*) general jurisdiction.  By its own admission, BMI "maintains its principal place of business in New York, New York" (quoting a BMI Court filing from November 2025).

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) since BMI's corporate headquarters is located 7 World Trade Center in New York, New York.

### III.      THE PARTIES

9.      Plaintiff BiCoastal Productions, Inc. ("BiCoastal") is a booking agency and at all relevant times discussed herein was the booking agent for The Guess Who ("the band"). BiCoastal is a Florida Corporation and has its principal place of business in Florida.

10.     Plaintiff Garry Peterson is a drummer and founding member of the band The Guess Who, who had numerous hit records, including *American Woman, These Eyes, Clap for the Wolfman, No Sugar Tonight, No Time,* and more. Garry Peterson is a resident of Florida.

11.   Plaintiff James Kale is a bass player and another founding member of the band The Guess Who.  James Kale resides in Manitoba, Canada.

12. Plaintiff KALPET LP is a limited partnership formed by Plaintiffs Garry Peterson and James Kale. Plaintiffs Garry Peterson, James Kale and KALPET LP were the owners at the relevant time of THE GUESS WHO trademark for entertainment services.

13. KALPET LP is a North Carolina LP and has its principal place of business in North Carolina.

14. Plaintiff Entertainment Services International, LLC is the management company for Garry Peterson, James Kale, KALPET LP and the other members of the band.

15.  Entertainment Services International, LLC is a Missouri LLC and has its principal place of business in Missouri.

16. Plaintiff Derek Sharp was the lead singer of the band. Greg Smith, Michael Staertow, Teddy Andreadis, and Leonard Shaw were the other performing musicians in the band.

17. Derek Sharp is a resident of Ontario, Canada. Greg Smith is a resident of Pennsylvania. Michael Staertow is a resident of Tennessee. Teddy Andreadis is a resident of California. Leonard Shaw is a resident of Manitoba, Canada.

18. Plaintiff Howard Klopak was the production manager of the band's shows. Howard Klopak is a resident of Manitoba, Canada.

19.  Plaintiff Brent Moreland was the stage manager for the band's shows. Brent Moreland is a resident of Louisiana.

20.  Plaintiff Linda Leichtweis was the band's tour manager. Linda Leichtweis is a resident of Michigan.

21.  Plaintiff RAM Production, Inc., provided the backline to the band's shows. RAM Production, Inc. is an Indiana Corporation based in Indiana.

22.  Plaintiff Music Works Concerts is one of the promoters who lost its profits and expenses for one of the cancelled shows. Music Works Concerts is a Florida Corporation and has its principal place of business in Florida.

23.    Plaintiff MRC Productions is another promoter of a canceled show. MRC Productions is a Florida Corporation  and has its principal place of business in Florida.

24.    Plaintiff Elko Concerts is another concert promoter who lost its profits and expenses for three canceled shows. Elko Concerts is a Florida based sole proprietorship owned by Michael Elko, a resident of Florida.

25.    Plaintiff Onesti Entertainment Corporation is an Illinois Corporation and has its principal place of business in Illinois. Onesti Entertainment Corporation is another promoter of a canceled show.

26.    Each of the Plaintiffs in this lawsuit share in the revenues obtained by the performances of the band or otherwise are economic partners. The band's live performance income is derived from the sale of tickets at the concert venues, with those revenues being divided between the concert venue, the promoters and the band.  As is customary in the music business, the agents and the management company's compensation is based on a percentage of the band's revenues, and of course, the income paid to all members of the band, and its crew and its backline supplier are also dependent on the band's revenues.

27. Defendant Broadcast Music, Inc. ("BMI") is one of the two predominant performing rights organizations in the United States.  BMI "is a Delaware-incorporated performing rights organization that maintains its principal place of business in New York, New York" (quoting a BMI Court filing).  American Society of Composers, Authors and Publishers ("ASCAP") is BMI's chief competitor; and between the two of them, they license over 90% of music to be publicly performed in scores of businesses that play music.  They license music to all businesses that play music or where music is performed, including live music venues.  Both BMI and ASCAP send money to their members as royalties.  The members consist of song writers and music publishers.

28.    Almost all concert venues take out licenses with BMI (and ASCAP), so that music can be lawfully performed and played at their venues.  Performing music live without a license would constitute a copyright violation. The penalties for willful and intentional copyright infringement are very steep – including up to $150,000 per violation in statutory damages. So, if

a band (or anyone else) were to perform ten of the Guess Who classic hits at a live music venue that lacked the necessary license for those songs to be performed, the venue and the band and all those contributing to the live music performance could be liable for $1.5 million dollars in statutory damages in this example.

29.    Besides collecting monies from establishments that play or perform music and paying songwriters and publishers their share of the monies, BMI administers the rights (along with ASCAP and the other smaller performing rights organizations), which is a matter of great importance in allowing for the efficient and organized authorized use of copyrighted material. By taking out a license with each of the performance rights organizations, each venue that plays music in one form or another, whether pre-recorded or live, does not have to track down the owners of the copyrights to the songs that are performed or played. The performing rights organizations offer a license to use all the songs in their catalogue, so no venue has to worry if a song being performed is licensed. Similarly, a band performing at any licensed venue has no need to worry. The venue's license with the performing rights organizations covers the band and its members as well as the venue.

30. Live music venues provide song lists to BMI and ASCAP.  These organizations assume the responsibility for licensing copyrighted music and ensuring that songwriters and publishers are compensated for the public performance of their works. Venues typically obtain a blanket license, which covers a wide range of music, but they are still required to track and report which songs are played to facilitate accurate royalty distribution.

31.  All those involved in the live music business rely upon the performing rights organizations, including BMI, to accurately provide information as to which songs are licensed and which songs are not. BMI enters into license agreements with songwriters, publishers and

venues that play and perform music for the benefit of not just the signatories, but also for the benefit of all third parties in the live music business, including managers, promoters, booking agents, etc., who rely upon BMI so they do not unintentionally get swept up in a copyright infringement lawsuit for a violation of someone's or some entity's music copyright.

## IV.    COMMON ALLEGATIONS

### A. Historical Background

32. The band The Guess Who was formed in Canada in the late 1960's and began finding tremendous commercial success in the late 1960's and early 1970's with iconic songs such as *American Woman, These Eyes, No Time* and many others. The core band during those early years when most of those hit songs were recorded consisted of Burton Cummings, lead singer and keyboard player; Randy Bachman on lead guitar; Garry Peterson on drums and James Kale on bass. Bachman, Peterson and Kale sang backup vocals. Bachman left the band around 1970 and went on to form Bachman-Turner Overdrive. Cummings left the band around 1975 to pursue a solo career, which resulted in the breakup of the band.

33. After the band split up, Plaintiff Kale with the blessing of Cummings and Bachman at the time, filed for and obtained a trademark for THE GUESS WHO with the United States Patent & Trademark Office (USPTO) around 1978 and continued to record and perform live the iconic hit songs of The Guess Who up until April of 2024. There were numerous personnel changes over those many years.

34. Although Kale and Peterson owned the United States Trademark registration for THE GUESS WHO, at a subsequent time thereafter, Burton Cummings had acquired 100% of the US publishing rights to nearly all of The Guess Who's catalogue of hit songs.

35. So, in October of 2023, Burton Cummings and Randy Bachman sued Kale and

Peterson in the United States District Court in the Central District of California, Case No. 2:23-cv-09130-FLA-MR for false advertising.

36. At the time the lawsuit was filed, Plaintiffs had been in the planning stages of their 2024 tour for several months, with many of those shows already booked. By April of 2024 that tour had expanded to 83 shows, with many more shows expected to be added to the end of that tour.

37. After being served with the lawsuit, Kale and Peterson filed a motion to dismiss which was pending when the acts and omissions by BMI complained of herein occurred in this case.

38. Cummings' publishing company Shillelagh Music ("Shillelagh") owned by Cummings, and Cummings canceled its affiliation agreement with SOCAN, the Canadian Performing Rights Association (which performs the same functions in Canada that ASCAP and BMI perform in the US) so that The Guess Who catalogue of songs would have no affiliation with any performing rights organization.

39. Cummings and his publishing company had previously issued their rights to The Guess Who catalogue of songs to BMI or to SOCAN, the Canadian performing rights society, which in turn has a sublicense agreement with BMI. SOCAN and BMI have an agreement pursuant to which SOCAN sublicenses its catalogue of songs to BMI for BMI to administer in the United States. In this case, BMI's rights to The Guess Who catalogue of songs derived from SOCAN, if not directly from Shillelagh.

**B. Cummings' Cease-And-Desist Letters; Plaintiffs' Communications with BMI**

40. On or around April 5, 2024, Cummings and his agents and representatives began

sending out "cease and desist letters" to venues, agents and/or others claiming that Cummings owns (through his publishing company Shillelagh) the exclusive rights to The Guess Who catalogue of songs and that nobody can publicly perform those songs anywhere in the United States. The cease-and-desist letters warned the reader of a potential suit for copyright infringement if anyone or any business were to infringe Cummings' copyrights by publicly performing any of the songs in The Guess Who catalogue.  Intentional and willful copyright infringement carries a penalty up to $150,000 per song in statutory damages, per use, so if the band were to perform a set of 10 classic Guess Who hits in an evening, the venue and band and all those working together could face potential liabilities of $1.5 million dollars in statutory damages.

41. Having already been sued for-false advertising claims in the US District Court, the Plaintiffs had to take Cummings cease-and-desist letters seriously. The Plaintiffs in this case sought clarity as to the effective date of the venues' termination of rights.

42. In this context, Plaintiffs wanted to know what the effective date was for the termination of rights.  BMI issues blanket licenses to venues for the venues to permit any song in their catalogue to be performed live.

43.  So once Cummings' cease-and-desist letters were sent out to various venues and to agents and others working on Plaintiffs' tour, Plaintiffs' representatives reasonably reached out to BMI and inquired what the effective date would be for the termination of the venues' rights to allow those songs to be performed.  The venues were already selling tickets to the public and the public was already purchasing tickets to hear the band play classic The Guess Who songs that many of the audience members grew up with (or otherwise had come to appreciate).  So, if the band could not play those classic hits, the shows would need to be canceled.

44. It is essential that a venue booking a live show for any musical act knows if the venue is permitted to allow that musical act to perform the music it contracted the musical act to perform.

45. BMI represents that the licenses it issues to concert venues protect concert venues from being sued for allowing musicians to publicly perform music for which BMI has an affiliation agreement. These licenses all contain standard non-negotiable terms that are presented to the venues on a take-it-or-leave-it basis, with no ability of the typical concert venue to negotiate any of the language of the license other than perhaps the fee.

46. In this case, after receiving a copy of one of the cease-and-desist letters (sent to venues who had booked The Guess Who), Randy Erwin, the principal owner of Plaintiff Entertainment Services International, LLC, the band's business manager, reached out to BMI to inquire as to when the affected songs would be withdrawn from the venues' license agreements with BMI.

47. After having been threatened with a lawsuit for copyright infringement by Burton Cummings if they were to perform any of classic The Guess Who hit songs, including *American Woman, These Eyes, Clap for the Wolfman, No Sugar Tonight, No Time,* etc., at their upcoming concerts, Plaintiffs were of course concerned that they could be liable for up to $150,000 per song in statutory damages, per performance for willful and intentional copyright infringement. Burton Cummings' law firm's threat of a subsequent potential lawsuit for willful copyright infringement was a threat that had to be taken very seriously, given that the Plaintiffs Peterson and Kale had already been sued by Cummings and Bachman.

48. Naturally, Plaintiffs and their representatives reached out to BMI to find out what was

the effective date of the termination of rights.  And Plaintiffs reasonably believed that BMI

would provide accurate information regarding the actual effective date of the termination.

49. In response to the inquiry, on or about April 6, 2024, Stuart Rosen, the senior vice

president and chief legal officer of BMI, informed Randy Erwin that the termination of Burton

Cummings' affiliation agreement with BMI was effective **"immediately"**.  At the time, Mr.

Rosen knew the importance of the issue and voluntarily assumed the responsibility of providing

a correct answer, knowing that Mr. Erwin and all those with whom he worked (i.e., Plaintiffs)

would rely upon the answer being correct and would rely upon the answer.  Mr. Rosen knew

that, by stating the termination was effective immediately, the tour would be canceled, and

Plaintiffs would incur damages.  At all times, Mr. Rosen was an authorized agent and

representative of BMI, whose statements were made on behalf of BMI.

50. Mr. Rosen subsequently repeated this same information – which (upon information

and belief) was mistaken – in writing a few days later (i.e., April 10, 2024).

51. The questions posed to Mr. Rosen were

(i)      whether those songs had been pulled from BMI's repertoire?

(ii)     when did it become effective?

(iii)    whether there were legs or a grace period in the venues' license agreements

that would allow for those songs to be performed at the band's upcoming

shows or not?

52. Mr. Rosen advised Mr. Erwin that those songs were no longer protected by

each-venue's license agreements **effective immediately**. Again, Mr. Rosen actually knew or

should have known or have been aware all affiliated parties would rely upon his advice and

would thereby immediately commence cancelling all upcoming shows, including the show that was scheduled that same day he rendered his advice.

### C.  <u>Plaintiffs' Cancellation of All Shows, In Reliance on BMI's Statements</u>

53. Reasonably relying upon the statements of Mr. Rosen (made on behalf of BMI first on April 6, 2024, and then again on April 10, 2024), Plaintiffs canceled all shows remaining that had been booked (for April 6, 2024, and thereafter), including even the show that the band was in the midst of a soundcheck on April 6, 2024.  Also, based upon Mr. Rosen's above-mentioned statements, Plaintiffs stopped pursuing the other shows that were soon to be booked;  i.e., in reasonable reliance on Mr. Rosen's statements of April 6 and 10, 2024 – which were made on behalf of BMI – Plaintiffs canceled all of their upcoming shows and ceased booking additional shows.  The cancelations and the cessation of further bookings caused very substantial financial harm to Plaintiffs, as further described below.

54. At the time of communications with Mr. Rosen and the cancellation of the shows and cessation of further booking efforts, it was reasonable and proper for Plaintiffs to rely upon the statements of BMI as to what the effective date was – particularly, considering that Plaintiffs were under extreme time pressure to decide whether to cancel upcoming shows.  Plaintiffs were under extreme time pressure to decide whether to cancel upcoming shows, for various reasons, including (without limitation) that there were imminently scheduled shows (e.g., an April 6, 2024 show for which a soundcheck was being performed) and venues and other parties needed advanced notice to make plans based on The Guess Who's cancellations (e.g., for venues to seek out replacement performers for the dates on which The Guess Who's shows had been scheduled).  Also, at the time of BMI's statements of April 6 and 10, 2024, BMI was, by far, the best-situated party to answer Plaintiffs' question as to when the termination became effective.

The information – as to what songs are licensed to BMI and in their repertoire and for how long – is within the purview and knowledge of BMI.  The contracts BMI has with SOCAN, the Canadian performing rights organization, are not publicly available.  Nor are the contracts BMI issues to songwriters, publishers and venues.

55. For all of these reasons, BMI and its representatives actually knew or should have known what was at stake and should have taken the time to properly ascertain the correct answer regarding the effective date of the termination of rights.  BMI provided its answer (that termination was effective "immediately") without qualifying the answer or otherwise indicating uncertainty.

### D.  Plaintiffs' Subsequent Ascertaining that BMI Had Apparently Provided Misinformation, Which Caused Plaintiffs Severe Harm

56. After the shows were canceled (and, indeed, after the dates of the canceled shows had passed), some of the Plaintiffs serendipitously had communications with an independent source, who – to Plaintiffs' surprise – had pertinent knowledge and, based on that knowledge, informed those Plaintiffs that they had been misinformed by Mr. Rosen of BMI.  (These communications were serendipitous in that the independent source unexpectedly informed Plaintiffs of information that allows them to hold BMI accountable via the present lawsuit, though (of course) the timing was unfortunate in that Plaintiffs only ascertained the pertinent information after Plaintiffs had suffered harm from relying on BMI's misinformation.)  From communications with the above-mentioned independent source, Plaintiffs ascertained that agreements – between, on the one hand, BMI (or SOCAN) and, on the other hand, artists and publishers – have a notice period that must elapse, between the date when the artist or publisher gives notice of termination of the license and the effective date of the termination of the license; and the notice period is sufficient that it would not yet have elapsed on the dates of The Guess Who shows that were

scheduled and then cancelled, in reliance on BMI's misinformation; i.e., contrary to BMI's misinformation, a copyright holder cannot simply provide notice of termination of rights effective immediately, in such a manner that would force the cancellation of all concerts that had already been planned, organized, and promoted.  Similarly, the dealings or agreements between SOCAN and BMI reflect notice periods – whereby a copyright holder's giving notice of termination of rights does not become effective immediately to terminate the rights. Here, contrary to BMI's misinformation, Cummings' termination was *not* yet effective on the dates of The Guess Who shows that were scheduled and then cancelled.

57. Accordingly, Mr. Rosen's April 6, 2024 statements (to Mr. Erwin) and Mr. Rosen's similar statements (on April 10, 2024) – whereby Mr. Rosen stated that the songs were no longer protected by each-venue's license agreements **effective immediately** – were false when made, and Mr. Rosen had no reasonable grounds for believing the statements to be true.  Indeed, it has become readily apparent that BMI never undertook reasonable or proper efforts to ascertain the correct answer regarding the effective date of the termination of rights.

58. Plaintiffs were harmed as a result of BMI's misrepresentations, on which Plaintiffs reasonably relied.  If Plaintiffs had known that BMI's above-quoted statements (via Mr. Rosen) of April 6 and 10, 2024 were false, then Plaintiffs would not have cancelled the concerts or ceased booking new concerts prior to the actual effective date of the termination of rights.  The cancellation of the existing shows and the cessation of further bookings caused Plaintiffs vast economic harm, as further discussed below.

### E.    Alternatively, BMI Has Been Spreading Misinformation Continuously for Years

59.    Alternatively, i.e., if BMI's above-quoted April 6 and 10, 2024 statements (that the rights had terminated effective "immediately") were actually correct, then this would render

other statements by BMI to be false and misleading. At all material times (including a period of time dating back to long prior to the dealings involving Plaintiffs in this case and up until the present time), BMI has continuously made public statements describing its role and function, including (without limitation) in its providing rights and assurance that a performance is with the license and authorization to use copyrighted works. For example (without limitation), on the FAQ page of BMI's website (https://www.bmi.com/licensing/faqs) there is a link to the following video footage:

https://youtu.be/iGH0OqZgJTE?list=PLuCP5yfCcYvtYDAkDCkENlMPd-1HHN0Gu

(herein, the "Video").

60.    In the Video, in response to the question, "Are the musicians, DJ's and entertainers responsible for the public performance fees when performing in my business?," the BMI representative answers:

> [No.] Since it's the business or organization who hires the musicians to perform for the benefit of their customers, it's their responsibility to cover the licensing fees associated with that performance. Music enhances the overall customer experience and a BMI license insures that you are legally covered to host that performance of music. We offer a wide range of licenses, so you only pay for the music you play, and we also offer flexible payment plans.

(Video.)

61.    The Video holds out BMI as providing legal protection and rights that can be relied upon – and demonstrates that BMI intends for third parties, including musicians other businesses (e.g., promoters and merchandisers), to rely upon the license agreements with venues. By having the Video continuously publicly available (online), BMI has continuously made the statements in the Video, on which other parties may rely.

62.    The Video confirms that BMI intends for third parties, including musicians and

entertainers, to believe that they will benefit from the license agreements with venues.  BMI deliberately fosters this false notion, because the belief financially benefits BMI.

63.  Yet, assuming the scenario whereby rights can be terminated effective "immediately" (in the copyright holder's sole discretion), BMI's representations and statements – including (without limitation) those in the above-referenced Video – would have been false when made and known (by BMI) to be false when made.  Under this scenario, it would be impractical and unwise to invest time and money into organizing and promoting music concerts, as the rug could be pulled right out from under everyone by a last-minute termination of the right to perform the music (such as what Cummings did here).  To be viable or successful, concerts must be organized and promoted in advance – e.g., in order to have time to arrange logistically and artistically, as well as to publicize the concerts to make them commercially successful.  Hence, assuming the scenario whereby rights can be terminated effective "immediately" (in the copyright holder's sole discretion), BMI's statements and assurances – e.g., those in the above-quoted Video – are false and were known to be false when made (or, alternatively, were made with no reasonable grounds for believing the statements to be true when made).  In other words, if (in the copyright holder's sole discretion) the copyright holder can actually provide notice terminating licensing rights *effective immediately*, then – in the context of organizing and promoting concerts, which involves planning many months in advance (indeed, often, a year or longer in advance) – a BMI license does *not* insure that anyone is "legally covered to host that performance of music." (Video.)  Rather, a BMI license has little, if any, value at all.

64. Under the above-described scenario (where, in the copyright holder's sole discretion, the copyright holder can actually provide notice terminating licensing rights *effective immediately*),  BMI knows that the services and rights that BMI purports to provide are actually

illusory and have far less value (if any value at all) than that which BMI advertises and represents via its false statements (such as those in the Video); i.e., BMI has made misrepresentations so as to deceive to protect their business model and deceive members of the public (such as Plaintiffs).  The representations were false when made, and BMI knew that they were false when made.  BMI intentionally and deliberately made the false representations so as to encourage members of the music industry to use BMI's services at the rates charged by BMI – while those members of the music industry remained ignorant that BMI's services has less value (if any value at all) than that which BMI advertises and represents via its false statements (such as those in the Video).

65. If the broader music community knew that BMI's licenses with writers and publishers were generally illusory because they actually permitted rights-holders (i.e., writers and publishers) to terminate a performance license immediately (in their sole discretion), this would have drastic consequences adverse to BMI.  Under this scenario, in the music community, concert venues would have a strong incentive  to negotiate licenses directly from rights-holders (i.e., the writers and publishers) or to require the performing artists to obtain such licenses themselves (for the songs to be performed, for the benefit of all participants in the concert, including the concert venue) directly with the music writers and publishers.  The concert venues or performing artists (through their agents and representatives) could negotiate to license the songs directly for specific performances, under license terms that would not permit termination (of rights) prior to the performance dates – i.e., the direct negotiations would seek to avoid the massive deficiency in the BMI licenses.  If concert venues (or songwriters) were to license the songs directly for specific performances (in a manner that did not permit termination prior to the performance dates) – which they could – then BMI would lose substantial business (i.e., revenue

and profits).  By way of analogy, when a feature film or TV show is made, the producers contract directly with the music publishers for the right to use particular music in a film; concert venues or performing artists (through their agents and representatives) could be tasked to do the same thing, if BMI licenses were illusory because they actually permitted rights-holders (i.e., writers and publishers) to terminate a performance license immediately (in their sole discretion).

66.    There is a historical reason for BMI to have knowingly and voluntarily assumed the responsibility of providing accurate information to Plaintiffs.  BMI, like ASCAP, operates based on a consent decree with the Department of Justice which regulates anticompetitive activity.  The purposes of the decree are: to prevent monopolization of music by ensuring music creators can directly license their works; to promote competition by having the requirement of equal terms for licensees and the availability of blanket licenses; and to ensure fairness for music users and creators. The decree is meant to ensure music users have access to a vast repertoire of music under fair and reasonable terms, and that songwriters and publishers are compensated for the public performance of their work.  In order for this system to function properly, BMI has agreed to disseminate to any music venue, and to anyone performing at a music venue or putting on a show at a music venue, accurate information as to which songs are covered by a BMI license.

67.  Plaintiffs reasonably relied upon BMI's statements in the above-quoted Video and similar statements, including (without limitation) in Plaintiffs' decisions to invest time and money into organizing and promoting The Guess Who concerts scheduled for April 6, 2024 and thereafter, at venues that have licenses with BMI.  Indeed, here, Plaintiffs had invested time and money over 12 months in the process of planning, organizing, and promoting the concerts.

68.    Again, assuming the scenario whereby rights can be terminated effective "immediately" (in the copyright holder's sole discretion): if Plaintiffs had known that BMI

misrepresented the nature of its functioning and the rights at issue (e.g., if the above-quoted statements in the Video were false), then Plaintiffs would not have invested time and money into organizing and promoting the concerts under the assumption that the copyright license was in place via BMI – particularly in light of the above-referenced trademark litigation that was commenced in October 2023.  Instead, Plaintiffs would have sought to license rights directly from the publishers of relevant musical selections and bypass Defendants completely, via a license that was not terminable prior to the concert dates (in the copyright holders' sole discretion); and, in the absence of such a direct license with appropriate terms, Plaintiffs would not have planned, organized, or promoted the concerts at issue (i.e., Plaintiffs would not have invested the time and money in organizing or promoting the concerts).

69.    Each of the Plaintiffs has suffered damages (including, without limitation, lost profits, expenses and other financial damages) as a proximate result of the acts and omissions of Defendant BMI and its representatives, including (without limitation) Defendant's breach of fiduciary duties to accurately inform the band and its representatives as to the effective date of BMI's loss of rights to The Guess Who catalogue.

70.    As a proximate result of the loss of revenue Kale and Peterson would have obtained from the  canceled concerts dates, in September 2024,  Kale and Peterson were forced for economic reasons to settle the lawsuit Cummings and Bachman had brought for false advertising.  They let go of the US trademark for THE GUESS WHO since without being able to perform the songs publicly, they were unable to use it.

71.    As a proximate result of the acts and omissions (of Defendant BMI), Plaintiff BiCoastal lost its commissions from the shows.

72.     As a proximate result of the acts and omissions of Defendant BMI, Plaintiffs Garry Peterson, James Kale and KALPET LP lost income, profits and expenses from each of the scheduled dates that were canceled.

73.     As a proximate result of the acts and omissions of Defendant BMI, Plaintiff Entertainment Services International, LLC – i.e., the management company of The Guess Who band – lost its commissions.

74.     Plaintiff Derek Sharp, the lead singer of The Guess Who, lost his earnings.

75.     The other performing musicians – including Plaintiffs Greg Smith, Michael Staertow, Teddy Andreadis, and Leonard Shaw – lost their earnings from the shows.

76.     Plaintiff Howard Klopak, the production manager of the shows, lost his earnings.

77.     Plaintiff Brent Moreland, the stage manager, lost his earnings.

78.     Plaintiff Linda Leichtweis, the tour manager, lost her earnings.

79.     Plaintiff RAM Production, Inc. – i.e., the backline provider to the shows that were canceled – lost its fees and expenses incurred.

80.     Plaintiff Music Works Concerts – which was a promoter of one of the canceled shows – lost its profits and expenses.

81.     Plaintiff MRC Productions – which was another one of the promoters of a canceled show – lost its profits and expenses.

82.     Plaintiff Elko Concerts – which was a concert promoter for three shows – lost its profits and expenses for three shows.

83. Plaintiff Onesti Entertainment – i.e., an operator of music venues – lost its profits and expenses for its canceled shows.

## FIRST COUNT
### (Breach of Fiduciary Duty)

84.    Plaintiffs hereby reallege and incorporate herein each and every preceding paragraph as if the same were fully set forth herein.

85.    When Plaintiffs reached out to duly authorized agents and representatives of Defendant BMI herein, Defendant BMI knowingly undertook an obligation to act on behalf of and for the benefit of Plaintiffs.

86.    Plaintiffs placed trust and confidence in Defendant BMI and the defendant BMI's duly authorized representatives and agents accepted the relationship.

87.    Plaintiffs were vulnerable to BMI.  Only BMI had the information needed to answer the questions as to the effective date of the termination. Plaintiffs had not seen the contracts, nor had they seen the termination notice. Only BMI had this information, and as a performing rights organization, they had and assumed the responsibility to inform, distribute, and disseminate accurate information to Plaintiffs regarding which songs were in their catalogue and the effective dates of any termination of rights.  Only BMI had the relevant facts, documents and information needed to determine the answers.

88.    BMI knowingly accepted the responsibility of providing accurate information as to the questions passed.  In theory they could have told Mr. Erwin to figure it out himself or go get a lawyer.  Instead, BMI told Mr. Erwin the termination was effective "immediately."

89.    And Plaintiffs James Kale, Garry Peterson and KALPET LP did have a lawyer (at Proskauer Rose) representing them in the false advertising litigation.  The law firm, Proskauer Rose, realizing that BMI was the only one with all the information necessary to provide an accurate answer, reached out to BMI just as Mr. Erwin did.  BMI confirmed in writing on April 10, 2024, to the Proskauer Rose law firm, that the termination was effective immediately.

90.    Providing information of the sort requested here is part of BMI's mission, which BMI publicly holds itself out as serving.  BMI makes various statements on its website describing what it does.  On the FAQ page, found at https://www.bmi.com/licensing/faqs, one of the videos (i.e., the "Video") has the following link:

https://youtu.be/iGH0OqZgJTE?list=PLuCP5yfCcYvtYDAkDCkENlMPd-1HHN0Gu.

91.    In response to the question, "Are the musicians, DJ's and entertainers responsible for the public performance fees when performing in my business?," the BMI representative in the Video answers:

> [No.]  Since it's the business or organization who hires the musicians to perform for the benefit of their customers, it's their responsibility to cover the licensing fees associated with that performance. Music enhances the overall customer experience and a BMI license insures that you are legally covered to host that performance of music. We offer a wide range of licenses, so you only pay for the music you play, and we also offer flexible payment plans.

(Video.)

92.     The Video confirms that BMI intends for third parties, including musicians and entertainers (and other parties involved with music performances), to believe that they will benefit from the license agreements with venues.  BMI deliberately fosters this false notion, because the belief financially benefits BMI.

93.    There's a historical reason for BMI to have knowingly and voluntarily assumed the responsibility of providing accurate information to Plaintiffs.  BMI, like ASCAP, operates based on a consent decree with the Department of Justice which regulates anticompetitive activity. The purposes of the decree are to prevent monopolization of music by ensuring music creators can directly license their works; to promote competition by having the requirement of equal terms for

licensees and the availability of blanket licenses; and to ensure fairness for music users and creators. The decree is meant to ensure music users have access to a vast repertoire of music under fair and reasonable terms, and that songwriters and publishers are compensated for the public performance of their work. Implicit in all of this is that BMI has agreed to disseminate to any music venue and anyone performing at a music venue or putting on a show at a music venue, accurate information as to which songs are covered by a BMI license.

94.    Of course, the information – as to what songs are licensed to BMI and in their repertoire and for how long – is solely within the purview and knowledge of BMI.  The contracts BMI has with SOCAN, the Canadian performing rights organization, are not publicly available. Nor are the contracts BMI issues to songwriters, publishers and venues.  So, there were no other sources for Plaintiffs to obtain the information they needed to determine when the termination's effective date would be – and whether to cancel the shows that were booked. Only BMI had the power, knowledge and resources to determine the effective date of the termination.

95.    However, BMI got the effective date wrong. Plaintiffs to their detriment relied upon this incorrect information and canceled the tour, when they did not need to.

96.    As a proximate result, Plaintiffs collectively have suffered millions of dollars in damages with an exact amount to be proven at the time of trial.

97. Also, among other things, Plaintiffs are entitled to *prejudgment* interest.

98.    In doing the acts heretofore alleged, Defendant BMI is liable for punitive and exemplary damages, because (*inter alia*) the wrongdoing was intentional or deliberate, has a fraudulent motive, and/or is in such conscious disregard of the rights of members of the music industry (including, without limitation, musicians, managers, and concert promoters organizers, such as Plaintiffs) that it is willful and wanton.

## SECOND COUNT
## (Negligent Misrepresentation)

99. Plaintiffs hereby reallege and incorporate herein each and every preceding paragraph as if the same were fully set forth herein.

100.   On or about April 6, 2024 and April 10, 2024, Stuart Rosen, the senior vice president and chief legal officer of BMI, communicating on behalf of BMI, mistakenly informed Randy Erwin that the effective termination date of Burton Cummings affiliation agreement with BMI was "immediately."  At the time, Mr. Rosen knew the importance of the issue and voluntarily assumed the responsibility of providing a correct answer, knowing that Mr. Erwin and all those that he worked with, i.e., the Plaintiffs, would depend upon the answer being correct and rely upon the answer. Mr. Rosen knew that by stating the termination was effective immediately, the tour would be canceled and Plaintiffs would incur damages.

101.   Mr. Rosen's statements to Mr. Erwin – whereby Mr. Rosen stated that the songs were no longer protected by each-venue's license agreements **effective immediately** – were false when made, and Mr. Rosen had no reasonable grounds for believing the statements to be true when he made them.  Plaintiffs have recently ascertained that agreements between BMI and artists and publishers require a notice period to elapse, between the artist or publisher giving notice of termination of the license and the effective date of the license; and the notice period had not elapsed in this instance.  Similarly, the dealings or agreements between SOCAN and BMI reflect notice periods – whereby a copyright holder's giving notice of termination of rights does not become effective immediately to terminate the rights.

102.   Mr. Rosen advised Mr. Erwin that those songs were no longer protected by each venue's license agreements **effective immediately**.  Mr. Rosen actually knew or should have known or have been aware all affiliated parties would rely upon his advice and would thereby

immediately commence cancelling all upcoming shows including the show that was scheduled that same day he rendered his advice.

103.   Plaintiffs reasonably relied upon BMI's statement of the effective date of the termination (i.e., "immediately") of the rights to The Guess Who catalogue.  In reasonable reliance upon the misrepresentations of BMI, Plaintiffs canceled all the shows that had been booked, including the show scheduled for April 6, 2024 and the shows scheduled to be held thereafter.  Also, based upon Defendant's representations, Plaintiffs stopped pursuing the other shows that were soon to be booked.  If Plaintiffs had known that BMI's above-quoted statements (via Mr. Rosen) of April 6 and 10, 2024 were false, then Plaintiffs would not have cancelled the concerts or ceased booking new concerts prior to the actual effective date of the termination of rights; i.e., if Plaintiffs had known that BMI's statements were false, then Plaintiffs would not have incurred the economic harm.  The cancellation of the existing shows and the cessation of further bookings caused Plaintiffs vast economic harm.   As a proximate result Plaintiffs collectively have suffered millions of dollars in damages, which will be proven at the time of trial.

104.   Also, among other things, Plaintiffs are entitled to prejudgment interest.

### THIRD COUNT
### (Fraud – Intentional Misrepresentation)

105.   Plaintiffs hereby reallege and incorporate herein each and every preceding paragraph as if the same were fully set forth herein.

106.   In the initial two Counts above, Plaintiffs have alleged that, on or about April 6 and 10, 2024 and April 10, 2024, BMI (via Mr. Rosen) made false representations – i.e., it was false for BMI (via Mr. Rosen) to represent that the effective termination date of Burton Cummings affiliation agreement with BMI was "immediately".

107.   In the alternative, if the rights for the venues to have the band perform the iconic The Guess Who songs actually were terminated effective "immediately", on or around March 31, 2024 – i.e., just before the tour was to begin – then BMI (via its duly authorized agents and representatives) intentionally misrepresented the nature of the rights that BMI routinely licenses to music venues and other parties (here, Plaintiffs and/or Plaintiffs' representatives); i.e., there were intentional misrepresentations that constitute fraud.  In other words, if it was not false for BMI to represent that the rights were terminated effective "immediately", then BMI's other representations – concerning the nature of the rights that BMI routinely licenses to music venues and other parties – were false in a manner that constitutes fraud by BMI.

108.   As stated above, at all material times (including a period of time dating back to long prior to the dealings involving Plaintiffs in this case and up until the present time), BMI has continuously made and disseminated (e.g., via the internet) public statements describing its role and function, including (without limitation) in its providing rights and assurance that a performance is with the license and authorization to use copyrighted works.  BMI has made public statements describing its role and function, including (without limitation) in its providing rights and assurance that a performance is made with a license and the authorization to use copyrighted works.  For example (without limitation), in the above-referenced Video (that was posted online at all material times), BMI states that "a BMI license insures that you are legally covered to host that performance of music." (Video.)  In reasonable reliance upon BMI's above-quoted ongoing and continuous representations, Plaintiffs invested time and money into organizing and promoting the concerts on the band's tour (which was scheduled to begin in April 2024) under Plaintiffs reasonable belief that the copyright license was in place and secure via BMI – without Plaintiffs needing to take any further action to obtain or verify a copyright license.

109.   At all material times, BMI's above-quoted ongoing and continuous representations were false – and were known, by BMI, to be false.  If (in the copyright holder's sole discretion) the copyright holder can actually provide notice terminating licensing rights *effective immediately*, then – in the context of organizing and promoting concerts, which involves planning many months in advance (indeed, often, a year or longer in advance) – a BMI license does *not* insure that anyone is "legally covered to host that performance of music" (Video); i.e., BMI's statements and representations (including those in the Video) are false.  Plaintiffs first learned of the falsity (of BMI's above-quoted ongoing and continuous representations) through the above-stated communications of April 6 and 10, 2024, whereby BMI informed Plaintiffs that rights for the venues to have the band perform the iconic The Guess Who songs were terminated effective "immediately", on or around March 31, 2024.  Prior to April 6 and 10, 2024, Plaintiffs were unaware of the falsity (of BMI's above-quoted ongoing and continuous representations, such as those in the Video).

110.   If Plaintiffs had known that BMI misrepresented the nature of its functioning and the rights at issue (e.g., if Plaintiffs had known that the above-quoted statements in the Video were false), then Plaintiffs would not have invested time or money into organizing and promoting the concerts under the assumption that the copyright license was in place via BMI – particularly in light of the then-pending litigation with Cummings (e.g., the above-referenced trademark litigation that was commenced in October 2023).  Instead, Plaintiffs would have sought to license rights directly from the publishers of relevant musical selections and bypass Defendant completely, via a license that was not terminable prior to the concert dates (in the copyright holders' sole discretion); and, in the absence of such a direct license with appropriate

terms, Plaintiffs would not have planned, organized, or promoted the concerts at issue (i.e., Plaintiffs would not have invested the time and money in organized or promoting the concerts).

111.   Under the above-described scenario (where, in the copyright holder's sole discretion, the copyright holder can actually provide notice terminating licensing rights *effective immediately*),  BMI knows that the services and rights that BMI purports to provide are actually illusory and have far less value (if any value at all) than that which BMI advertises and represents via its false statements (such as those in the Video); i.e., BMI has intentionally and purposely made misrepresentations so as to deceive to protect their business model and deceive members of the public (such as Plaintiffs).  The representations were false when made, and BMI knew that they were false when made.  BMI intentionally and deliberately made the false representations so as to encourage members of the music industry to use BMI's services at the rates charged by BMI – while those members of the music industry remained ignorant that BMI's services has less value (if any value at all) than that which BMI advertises and represents via its false statements (such as those in the Video).

112. If the broader music community knew that BMI's licenses with writers and publishers were generally illusory because they actually permitted rights-holders (i.e., writers and publishers) to terminate a performance license immediately (in their sole discretion), this would have drastic consequences adverse to BMI.  Under this scenario, in the music community, concert venues would have a strong incentive seek to obtain  licenses directly from rights-holders (i.e., the writers and publishers) or to require the performing artists to seek to negotiate and obtain such licenses themselves (for the songs to be performed) directly with the music writers and publishers.  The concert venues or performing artists (through their agents and representatives) could negotiate to license the songs directly for specific performances, under

license terms that would not permit termination (of rights) prior to the performance dates – i.e., the direct negotiations would seek to avoid the massive deficiency in the BMI licenses.  If concert venues (or songwriters) were to license the songs directly for specific performances (in a manner that did not permit termination prior to the performance dates) – which they could – then BMI would lose substantial business (i.e., revenue).  By way of analogy, when a feature film or TV show is made, the producers contract directly with the music publishers for the right to use particular music in a film; concert venues or performing artists (through their agents and representatives) could be tasked to do the same thing, if BMI licenses were illusory because they actually permitted rights-holders (i.e., writers and publishers) to terminate a performance license immediately (in their sole discretion).

113.  Assuming that Mr. Rosen's representation as to the effective date of the loss or rights was correct, Plaintiffs were damaged as a result of BMI's  intentional misrepresentation as to the nature of the rights and services it licenses to the music industry and the services it licensed to the Plaintiffs' representatives and affiliates. As a proximate result, Plaintiffs collectively have suffered millions of dollars in damages s which will be proven at the time of trial.

114. Also, among other things, Plaintiffs are entitled to prejudgment interest.

115. In doing the acts heretofore alleged, Defendant BMI is liable for punitive and exemplary damages, because (*inter alia*) the wrongdoing was intentional or deliberate, has a fraudulent motive, and/or is in such conscious disregard of the rights of members of the music industry (including, without limitation, musicians, managers, and concert promoters organizers, such as Plaintiffs) that it is willful and wanton.

## FOURTH COUNT
### (Negligent Misrepresentation (Alternate Theory))

116.  Plaintiffs hereby reallege and incorporate herein each and every preceding paragraph as if the same were fully set forth herein.

117.  The third Count (above) presents a theory of liability that is an alternative theory of liability to that presented in the second count (above).  In the third count (above), Plaintiffs have alleged that, if the rights for the venues to have the band perform the iconic The Guess Who songs actually were terminated effective "immediately", on or around March 31, 2024 – i.e., just before the tour was to begin – then BMI via its duly authorized agents and representatives intentionally misrepresented the nature of the rights it routinely licenses to music venues sign on behalf of themselves, Plaintiffs' and/or Plaintiffs' representatives; i.e., there were intentional misrepresentations that constitute fraud.

118. In the alternative, here, Plaintiffs allege that, if the rights for the venues to have the band perform the iconic The Guess Who songs actually were terminated effective "immediately", on or around March 31, 2024 – i.e., just before the tour was to begin – then BMI  is liable for *negligent misrepresentation*; i.e., the misrepresentations alleged in third Count (above) were negligent.

119. As stated above, at all material times (including a period of time dating back to long prior to the dealings involving Plaintiffs in this case and up until the present time), BMI has continuously made and disseminated (e.g., via the internet) public statements describing its role and function, including (without limitation) in its providing rights and assurance that a performance is with the license and authorization to use copyrighted works.  BMI has made public statements describing its role and function, including (without limitation) in its providing rights and assurance that a performance is made with a license and the authorization to use copyrighted

works.  For example (without limitation), in the above-referenced Video (that was posted online at all material times), BMI states that "a BMI license insures that you are legally covered to host that performance of music." (Video.)  In reasonable reliance upon BMI's above-quoted ongoing and continuous representations, Plaintiffs invested time and money into organizing and promoting the concerts on the band's tour (which was scheduled to begin in April 2024) under Plaintiffs reasonable belief that the copyright license was in place and secure via BMI – without Plaintiffs needing to take any further action to obtain or verify a copyright license.

120.    At all material times, BMI's above-quoted ongoing and continuous representations were false – and were known, by BMI, to be false.  If (in the copyright holder's sole discretion) the copyright holder can actually provide notice terminating licensing rights *effective immediately*, then – in the context of organizing and promoting concerts, which involves planning many months in advance (indeed, often, a year or longer in advance) – a BMI license does *not* insure that anyone is "legally covered to host that performance of music" (Video); i.e., BMI's statements and representations (including those in the Video) are false.  Plaintiffs first learned of the falsity (of BMI's above-quoted ongoing and continuous representations) through the above-stated communications of April 6 and 10, 2024, whereby BMI informed Plaintiffs that rights for the venues to have the band perform the iconic The Guess Who songs were terminated effective "immediately", on or around March 31, 2024.  Prior to April 6 and 10, 2024, Plaintiffs were unaware of the falsity (of BMI's above-quoted ongoing and continuous representations, such as those in the Video).

121.If Plaintiffs had known that BMI misrepresented the nature of its functioning and the rights at issue (e.g., if Plaintiffs had known of the above-quoted statements in the Video were false), then Plaintiffs would not have invested time or money into organizing and

promoting the concerts under the assumption that the copyright license was in place via BMI – particularly in light of the then-pending litigation with Cummings (e.g., the above-referenced trademark litigation that was commenced in October 2023).  Instead, Plaintiffs would have sought to license rights directly from the publishers of relevant musical selections and bypass Defendant completely, via a license that was not terminable prior to the concert dates (in the copyright holders' sole discretion); and, in the absence of such a direct license with appropriate terms, Plaintiffs would not have planned, organized, or promoted the concerts at issue (i.e., Plaintiffs would not have invested the time and money in organized or promoting the concerts).

122. Under this scenario (where, in the copyright holder's sole discretion, the copyright holder can actually provide notice terminating licensing rights *effective immediately*),  BMI had no reasonable grounds for believing the statements to be true when BMI made them, regarding the services and rights that BMI purports to provide; i.e., BMI has made misrepresentations – without having reasonable grounds for believing the statements to be true when BMI made them – thereby deceiving members of the public (such as Plaintiffs).  The representations were false when made, and BMI had no reasonable grounds for believing the statements to be true when made.

123.  If Mr. Rosen's representation as to the effective date of the loss or rights was correct, Plaintiffs were damaged as a result of BMI's negligent misrepresentation as to the nature of the rights and services it licenses to the music industry and the services it licensed to the Plaintiffs' representatives and affiliates. As a proximate result, Plaintiffs collectively have suffered millions of dollars in damages s which will be proven at the time of trial.

124. Also, among other things, Plaintiffs are entitled to prejudgment interest.

**FIFTH COUNT**
**(For Intentional Interference With Contractual Relations)**

125.   Plaintiffs hereby reallege and incorporate herein each and every preceding paragraph as if the same were fully set forth herein.

126.   At all material times, there were valid and existing contracts to which Plaintiffs were parties concerning the band's concerts that were scheduled to be held on April 6, 2024 and thereafter, including (without limitation): contracts between Plaintiffs and the concert venues; and contracts between different Plaintiffs (e.g., between promotors and the band, as well as contracts between merchandise vendors and the band, etc.), whose existence is standard and necessary for any concert by an established music group on this scale.

127.   At all material times, Defendant BMI actually knew or should have known of the existence of all of the above-mentioned contractual relationships.  As stated above, the existence of these contracts is standard and necessary for any concert by an established music group on this scale.  Moreover, the existence of these contractual relationships was set forth in or readily apparent from publicly-available information (e.g., publicity and advertisements) for the band's concerts that were scheduled to be held on April 6, 2024 and thereafter.

128.   The above-referenced contracts were not at-will contracts.  For example, without limitation, the contracts did not permit the band to cancel a contracted performance because the band subsequently got a more favorable offer from a different venue on the contractually-scheduled performance date; nor did the contracts permit the venue to cancel a contracted performance because it subsequently found a more popular performer for the contractually-scheduled performance date.  These are just illustrative examples of how the contracts were not at-will.

129.   The contracts could be canceled for some reasons, including (without limitation) the previously-unforeseen circumstances by which parties is made aware of information that leads it to believe that the band no longer has copyright authorization to perform the songs that had been expected and planned to be featured in concerts scheduled to be held on April 6, 2024 and thereafter.

130.   BMI and/or its duly authorized agents either intended to disrupt the performance of the above-mentioned contracts or knew that disruption of performance was certain or substantially certain to occur from BMI's providing misinformation regarding the effective date of the termination of rights to perform the songs at issue on the scheduled.  As stated above, this misinformation foreseeably led Plaintiffs to believe that the band no longer had copyright authorization to perform the songs that had been expected and planned to be featured in concerts scheduled to be held on April 6, 2024 and thereafter – and foreseeably disrupted the above-mentioned contracts, which had to be cancelled or terminated, based on these circumstances.

131.   Plaintiffs were harmed, and the conduct of BMI and/or its duly authorized agents was a substantial factor in causing Plaintiffs' harm – including as set forth more fully above. Plaintiffs collectively have suffered millions of dollars in damages with an exact amount to be proven at the time of trial.

132.   Also, among other things, Plaintiffs are entitled to *prejudgment* interest.

133.   In doing the acts heretofore alleged, Defendant BMI is liable for punitive and exemplary damages, because (*inter alia*) the wrongdoing was intentional or deliberate, has a fraudulent motive, and/or is in such conscious disregard of the rights of members of the music industry (including, without limitation, musicians, managers, and concert promoters organizers, such as Plaintiffs) that it is willful and wanton.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiffs pray for judgment in their favor as follows:

1. For general damages and special damages in an amount according to proof at trial, and well beyond the jurisdictional minimum of this Court, in an amount believed to be several million dollars.

2. For economic losses, in an amount according to proof at trial.

3. For actual, compensatory, and reliance damages in an amount to be determined at the trial of this action and estimated to be several million dollars.

4. For damages to the credibility and reputation of Plaintiffs and their ongoing business.

5. For loss of the prosperous and ongoing business entity of over 45 years and forfeiture of the trademark.

6. For punitive damages based on the willful, oppressive, fraudulent, and malicious, conduct of Defendant BMI.

7. An injunction preventing Defendant BMI from offering licenses to live music venues without making disclosures in boldface prominent type informing the live music venues that irrespective of the agreement signed, permission for them to allow performances of any particular musical composition or selections of musical compositions can be withdrawn at a moment's notice for any or no reason at all, based upon the whim of a songwriter or publisher.

8. For interest upon any judgment entered as provided by law.

9. For costs of suit herein incurred, including (without limitation) reasonable attorney fees.

10. For such other and further relief as this Court may deem just and proper.

DATED:  January 28 , 2026                    Michael Machat

                                By: _____
                                       *Michael Machat*

                                Michael Machat

                                Machat & Associates, PC
                                8730 W. Sunset Blvd., Ste. 250
                                West Hollywood, CA 90069
                                Tel: (310) 860-1833
                                Email: Michael@machatlaw.com,
                                jeremy@machatlaw.com
                                Attorneys for Plaintiffs

### JURY TRIAL DEMAND

        Plaintiffs hereby request trial by Jury.


DATED:  January 28 , 2026                    Michael Machat

                                By: _____
                                       *Michael Machat*

                                Michael Machat

                                Machat & Associates, PC
                                8730 W. Sunset Blvd., Ste. 250
                                West Hollywood, CA 90069
                                Tel: (310) 860-1833
                                Email: Michael@machatlaw.com,
                                jeremy@machatlaw.com
                                Attorneys for Plaintiffs